IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, etc., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION 15-0342-WS-B |
| ZURICH AMERICAN INSURANCE COMPANY, etc., et al., | ) ) ) ) | |
| Defendants. | ) | |

## ORDER

The Court has indicated in a recent order that it will address piecemeal the issues raised by the remaining parties' seven motions for summary judgment. This order addresses certain arguments raised by the plaintiffs and defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National")[1] in their competing motions for summary judgment.   (Docs. 340, 374).[2]  Familiarity with the underlying facts and issues is assumed.[3]

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no

---

[1] National's original motion for summary judgment, (Doc. 314), which has been superseded by the current version, (Docs. 335, 339), is **denied as moot**.

[2] This order, along with the Court's order regarding the 2008 MSA, resolve all issues raised by National's motion other than with respect to the plaintiffs' bad faith claims.

[3] Other parties mentioned herein include defendants Aspen Specialty Insurance Company ("Aspen") and S&S Sprinkler Co. ("S&S") and former defendant Zurich American Insurance Company ("Zurich").

genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id.* "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.*; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address

2

another party's assertion of fact as required by Rule 56(c), the court may …
consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all
reasonable inferences, must be viewed in the light most favorable to the
nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243
(11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence
supporting a party's position.[4]  Accordingly, the Court limits its review to the
exhibits, and to the specific portions of the exhibits, to which the parties have
expressly cited.  Likewise, "[t]here is no burden upon the district court to distill
every potential argument that could be made based upon the materials before it on
summary judgment," *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599
(11th Cir. 1995), and the Court accordingly limits its review to those arguments the
parties have expressly advanced.

## I.  Minimum Limits.

Under the heading of "Limits of Insurance," National's policy provides in
pertinent part as follows:

> [T]he most we will pay for damages under this policy on behalf of
> any person or organization to whom you are obligated by written
> Insured Contract to provide insurance such as is afforded by this
> policy is *the lesser of* the Limits of Insurance shown in Item 3 of
> the Declarations or *the minimum Limits of Insurance you agreed*
> *to procure in such written Insured Contract*.

---

[4] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it
may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc*., 144
F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the
referenced portions of these [summary judgment] materials, but is not required to do
so.").  "[A]ppellate judges are not like pigs, hunting for truffles buried in briefs," and
"[l]ikewise, district court judges are not required to ferret out delectable facts buried in a
massive record …."  *Chavez v. Secretary, Florida Department of Corrections*, 647 F.3d
1057, 1061 (11th Cir. 2011) (internal quotes omitted).

(Doc. 348-15 at 10 (emphasis added)).  The policy provision addressing additional insureds provides in pertinent part as follows:

> [T]he insurance provided will not exceed *the lesser of*:
>     a.  The coverage and Limits of Insurance of this policy, or
>     b.  *The coverage and Limits of Insurance required by said contract or agreement*.

(*Id*. at 53 (emphasis added)).  National relies on the italicized language as limiting its exposure to the minimum limits of the 2008 MSA.  National argues that the minimum limits of insurance under the 2008 MSA are either $1 million or $3 million, either of which is less than its $8 million policy limits.  National further argues that, because its policy is a second-tier excess policy, the $3 million is satisfied by Zurich's $1 million primary policy and Aspen's $2 million first-tier excess policy, leaving nothing for National to pay.[5]

The plaintiffs identify Alabama law as governing construction of National's policy, (Doc. 375 at 26), and National expresses no disagreement.  Accordingly, the Court applies Alabama law to the policy.

"The court must enforce the insurance policy as written if the terms are unambiguous …."  *Safeway Insurance Co. v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005).  "Whether a provision of an insurance policy is ambiguous is a question of law."  *Id*.  "If a word or phrase is not defined in the policy, then the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it."  *Id*.  That is, "[w]hen analyzing an insurance policy, a court gives words used in the policy their common, everyday meaning and interprets them as a reasonable person in the insured's position would have understood them."  *Baldwin Mutual Insurance Co. v. Adair*, 181 So. 3d 1033, 1042 (Ala. 2014) (internal quotes omitted).  "A term is ambiguous only if, applying the ordinary meaning, one would conclude that the provision

---

[5] National makes a similar argument based on the 2007 MSA and the online terms and conditions.  As resolved in a previous Court order, neither of those documents supplies the terms and conditions governing the Purchase Order, so National's argument based on them necessarily fails.

containing the term is reasonably susceptible to two or more constructions."
*Herrera*, 912 So. 2d at 1144 (internal quotes omitted).

"To the extent the language of an insurance policy provision is ambiguous, all ambiguities must be resolved against the insurance company." *Herrera*, 912 So. 2d at 1143; *accord Travelers Casualty and Surety Co. v. Alabama Gas Corp.*, 117 So. 3d 695, 700 (Ala. 2012); *First Mercury Syndicate, Inc. v. Franklin County*, 623 So. 2d 1075, 1077 (Ala. 1993). This principle extends to ambiguities regarding the amount the insurer is to pay. *Safeway Insurance Co. v. Amerisure Insurance Co.*, 707 So. 2d 218, 221, 223 (Ala. 1997). The plaintiffs invoke this rule of strict construction against the insurer. (Doc. 348 at 29; Doc. 375 at 27, 29). National ignores the rule but is nevertheless bound by it.

The 2008 MSA includes an Exhibit A, entitled "Insurance Requirements (Services)." (Doc. 348-4 at 8). It provides in pertinent part as follows:

> During the term of this Agreement, Contractor shall maintain, at its own expense, the following minimum insurance coverages and limits:
>
> …
>
> B. Commercial General Liability Insurance, which shall be at least as broad as the coverage provided by a standard form Commercial General Liability Policy (ISO CG 00 01 01 96 with standard exclusions "a" through "n," ISO CG 00 01 07 98 with standard exclusions "a" through "o," or ISO CG 00 01 10 01 with standard exclusions "a" through "o"), with minimum limits of $_____ for Bodily Injury and Property Damage per occurrence and in the aggregate. ….

(*Id.*).

National acknowledges that Exhibit A leaves blank the minimum limits of insurance required. To fill the gap, National proposes an examination of extrinsic evidence to determine the contracting parties' intent. This evidence, National maintains, reflects that the contracting parties intended the minimum limits to be $3 million.

National fails to begin, as it must, with the language of its policy. As noted, the policy specifies that the minimum limits of insurance must be those

S&S "agreed to procure *in* such *written* Insured Contract."  (Doc. 348-15 at 10) (emphasis added)).  A reasonable construction of the quoted phrase is that the numerical value of the minimum limits must appear within the four corners of S&S's contract with the plaintiff.  Because the provision can be reasonably read in this restrictive sense, and because it is the meaning most favorable to the insured, the Court must adopt this construction.[6]  Thus, National cannot rely on extrinsic evidence to establish any particular minimum limits of insurance.[7]

As an alternative means of establishing a $3 million figure, National argues that the online terms and conditions (which expressly require at least $3 million in insurance) supply the minimum limits.  The argument is convoluted even by the standards of this litigation but may be distilled as follows:  (1) the reference in the Purchase Order to Form 7141 superseding the terms and conditions "herein" means that the online terms and conditions are an exhibit to the Purchase Order;

---

[6] The second provision on which National relies does not specifically require that the minimum limits be expressed in the written contract, but neither does it specifically permit the minimum limits to be divined by other means.  In other words, the second provision does nothing to eliminate the ambiguity created by the first provision.

[7] National's effort to use extrinsic evidence to fill in the blank suffers from additional, apparently insurmountable problems as well.  First, the Delaware case on which National relies as providing a gateway to the consideration of extrinsic evidence actually holds that, outside the context of reformation or the covenant of good faith and fair dealing (neither of which National invokes), "it is not the proper role of a court to … supply omitted provisions to a written agreement."  *Cincinnati SMSA Limited Partnership v. Cincinnati Bell Cellular Systems Co.*, 708 A.2d 989, 992 (Del. 1998).  Second, National relies primarily on two letters that accompanied the draft 2008 MSA when it was presented to S&S, but the 2008 MSA's integration clause unambiguously prohibits reliance on such pre-agreement communications, understandings, etc.  (Doc. 348-4 at 7).  Third, the internal Georgia-Pacific documents stressed by National do not, as National insists, "mandate" $3 million minimum limits, and in any event National has identified no evidence that S&S was aware of these documents or their contents, without which awareness there could have been no meeting of the minds that their provisions would apply.  Fourth, National offers no authority suggesting that the minimum limits appearing in MSA's entered years later with unrelated entities can be extrapolated into the December 2008 MSA with S&S.  Similarly, National does not support its assumption that it can read into the 2008 MSA minimum limits appearing in different MSAs that S&S entered at different locations in different years.

(2) the 2008 MSA identifies the "Agreement" as consisting of the 2008 MSA, exhibits thereto, the purchase orders issued pursuant thereto, and exhibits to such purchase orders, (Doc. 348-4 at 7), thus including the online terms and conditions as part of the contracting parties' agreement; (3) the 2008 MSA specifies that the terms and conditions of "this Agreement" shall "control over any conflicting provision set forth or referred to in any Purchase Orders, drawings, specifications or other exhibits hereto," (*id.*); (4) the online terms and conditions' provision for $3 million minimum limits does not "conflict" with the blank minimum limits in the 2008 MSA; and (5) since there is no conflict, the online terms and conditions' $3 million minimum limits are controlling.  (Doc. 340 at 29, 31-32; Doc. 388 at 10-11).

The problem, as addressed in the Court's previous order, is that the Purchase Order unambiguously eliminates the online terms and conditions as supplying any of the terms and conditions governing the Purchase Order.  Even if the online terms and conditions are an "exhibit" to the Purchase Order, they are an exhibit without applicability, and the 2008 MSA does not purport to restore them.  All it addresses is the viability of otherwise applicable terms and conditions lying outside its four corners, permitting non-conflicting ones to be enforced.  That is, the 2008 MSA identifies which of the living may survive; it does not resurrect the dead.

Finally, National argues that, in the absence of parol evidence, the four corners of the 2008 MSA establish the minimum limits as $1 million.  The idea is that Exhibit A requires S&S to maintain only "Commercial General Liability" insurance, which National construes to mean only primary coverage, not excess or umbrella coverage.  Under such a construction, Zurich's primary policy limits of $1 million constitute the minimum limits of the 2008 MSA.  (Doc. 340 at 28-30).

The Court agrees with the plaintiffs, (Doc. 348 at 32), that National is confusing concepts.  What Exhibit A unambiguously requires is CGL "insurance"

– insurance against the risks commonly covered by CGL policies.[8]  The 2008 MSA does not restrict the delivery mechanism of such insurance to primary polices; on the contrary, it explicitly states that "[t]he minimum limits of coverage required by this Agreement may be satisfied by a combination of primary and excess or umbrella insurance policies."  (Doc. 348-4 at 6).[9]

Even had the 2008 MSA established minimum limits of insurance, the Court agrees with the plaintiffs that National could not claim payments under the Zurich and Aspen policies as offsets to its own obligation to pay such minimum limits.  (Doc. 348 at 32-34; Doc. 375 at 29-30).  The National policy provides that "the most *we* will pay" is the lesser of such minimum limits or the policy limits, (Doc. 348-15 at 10), and the policy defines "we" as "the company providing this insurance," *i.e.*, National.  (*Id.* at 7).  It is thus at least reasonable – if not inescapable – that the quoted language identifies the amount National itself will pay, without any setoff for payments made by Zurich or Aspen.  The policy appears to be unambiguous in this regard,[10] but even if it could reasonably be

---

[8] Such policies "are designed to protect the insured from losses arising out of business operations" and are "generally designed to provide coverage for tort liability for physical damages to others."  S. Plitt, D. Maldonado, J. Rogers & J. Plitt, 9A Couch on Insurance § 129:1 (3rd online ed. 2016).

[9] National points out that all the forms listed in Exhibit A are primary CGL forms. This may be so (National fails to prove the point), but Exhibit A does not thereby restrict the required insurance to primary policies.  As Exhibit A specifically says, the forms are listed only to identify how "broad … the coverage" must be, (Doc. 348-4 at 8), not the form on which the coverage must appear.  There is no ambiguity on this score.

The Texas decision on which National relies for the proposition that "'commercial general liability insurance' means primary coverage," (Doc. 340 at 31 n.12), actually held only that a contractor cannot satisfy its obligation to provide CGL insurance by obtaining merely an excess or umbrella policy with no underlying primary coverage – not that the quoted phrase does not extend beyond primary coverage.  *Pac-Van, Inc. v. CHS, Inc.*, 2014 WL 1322761 at *4 (S.D. Tex. 2014).

[10] As noted, the policy also states that "the insurance provided" will not exceed the minimum limits of insurance required by an underlying contract.  (Doc. 348-15 at

construed as National suggests,[11] the resulting ambiguity would have to be resolved against National.

For the reasons set forth above, National cannot escape liability based on the "minimum limits" language of its policy.  National's exposure is the full amount of its policy limits.  The plaintiffs' motion for summary judgment is **granted** to the extent it seeks a ruling that National's exposure is not limited by the provisions discussed above.  National's motion for summary judgment is **denied** to the extent it seeks a ruling that its exposure is so limited.


### II.  Additional Policy Arguments Based on the 2008 MSA.

National's policy provides that an "Insured" includes one:

> to whom you become *obligated* to include as an additional insured *under this policy*, as a result of any contract or agreement you enter into which requires you to furnish insurance to that [one] *of the type* provided by this policy ….

(Doc. 348-15 at 54 (emphasis added)).  From these few words, National wrings three additional arguments for avoiding coverage.

First, National suggests that, without specific minimum limits set forth in the 2008 MSA, any purported insurance requirement therein is too vague to be enforceable under Delaware law,[12] such that S&S is not "obligated" to provide any insurance at all.  (Doc. 400 at 21 n.13; Doc. 388 at 15).  Even assuming for the sake of argument that the failure of the 2008 MSA to spell out the minimum limits

---

53).  Especially in light of the provision quoted in text, this provision must mean the insurance provided by National, not by all insurers combined.

[11] To support its construction, National relies on the policy's identification of the Zurich and Aspen policies as establishing $3 million of retained limits.  (Doc. 348-15 at 56-57; Doc. 388 at 18; Doc. 400 at 30).  All that provision reflects, however, is that National is not responsible for the first $3 million of loss; the provision says nothing whatsoever about National's responsibility after that figure is exceeded.  The New York cases on which National relies are wholly inapposite on their facts and, properly read, fully support the Court's conclusion.

[12] Delaware law governs construction of the 2008 MSA.  (Doc. 348-4 at 6).

renders the *minimum limits* of CGL insurance vague, it does not render vague the explicit, unambiguous requirement that S&S maintain *some* level of CGL insurance.  (Doc. 348-4 at 8).  The 2008 MSA therefore "obligated" S&S to carry CGL insurance with the plaintiff as an additional insured.  Even if the quoted term could reasonably be read more restrictively, it is at least ambiguous in this regard, and that ambiguity must be resolved by adopting the construction most favorable to coverage.

Second, National argues that the "type" of insurance provided by its policy is excess coverage and that the 2008 MSA, even if it permits S&S to obtain such a policy, does not require it.  (Doc. 340 at 29-30).  National again fails to acknowledge that ambiguities in its policy must be construed against it, and "type" can reasonably be read as meaning not the tier of exposure (excess) but the universe of risks insured against (commercial general liability).  It is patently obvious that the National policy insures against the same sorts of risks as the Zurich and Aspen policies, (Doc. 348-15 at 7-8), and that it provides CGL coverage.[13]  The 2008 MSA therefore "requires" insurance "of the type provided by" National's policy.

Third, National suggests that the phrase, "under this policy," precludes coverage unless the 2008 MSA referenced the very policy National ultimately issued.  (Doc. 340 at 30-31).  The endorsement, however, plainly requires only that S&S, in order to comply with the 2008 MSA's insurance requirements, had to obtain the sort of insurance (CGL) provided by the policy.  Even if there were any ambiguity in this regard, it must be resolved against National's position.

For the reasons set forth above, National cannot escape liability based on any of the arguments addressed in this section.  National's motion for summary

---

[13] National protests that its policy is for "commercial excess liability," not "commercial general liability."  (Doc. 388 at 7).  Again, National confuses tier of coverage with scope of coverage.

judgment is **denied** to the extent it rests on any of these grounds.  The Court's resolution of these arguments is final for all purposes in this litigation.

### III.  Other Insurance.

In opposition to the plaintiffs' motion for summary judgment, National argues that, pursuant to its policy, it owes the plaintiff nothing until the plaintiff's own insurer pays its policy limits.  (Doc. 400 at 30-31).  As the plaintiffs note, (Doc. 436 at 14-15), National devotes a total of 15 lines of argument to a complex, delicate issue requiring examination and reconciliation of multiple provisions of at least three policies and numerous strands of Alabama insurance law – without citation to any legal authority and with citation to only one of the three involved policies.  Successful arguments are not constructed of such flimsy material. National had the opportunity to raise and properly address this issue on its motion for summary judgment but elected not to do so, and its window of opportunity to obtain a ruling in this forum has now closed.

DONE and ORDERED this 16th day of December, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE